BALMER, J.
**373 The Energy Facility Siting Council modified its rules that govern amending site certificates. Petitioners challenge the validity of the new rules, arguing that the council failed to comply with required rulemaking procedures and that the rules exceed the council's statutory authority. For the reasons that follow, we agree with some, but not all, of those grounds and conclude that the rules are invalid.
I. BACKGROUND
The council consists of seven public members, ORS 469.450(1), who oversee the development of large energy facilities in Oregon, including electric power generating plants, high-voltage transmission lines, gas pipelines, and radioactive waste disposal sites, among other projects, ORS 469.300(11). The council carries out that task by issuing site certificates to developers. See ORS 469.320(1) ("[N]o facility shall be constructed or expanded unless a site certificate has been issued for the site."). A site certificate authorizes the certificate holder to construct, operate, and retire a facility on an approved site, subject to the conditions that the council includes in the certificate. ORS 469.401(1) ;
*56 see ORS 469.300(26) (defining "site certificate").
Because site certificates address how and where large energy facilities will operate, applications for site certificates are often long, with many technical details that raise complicated questions of law and policy. To help resolve those complexities, the legislature has tasked the Oregon Department of Energy (ODOE) to provide "clerical and staff support" for the council. ORS 469.450(6) ; see also ORS 469.040(1)(b) (requiring the director of ODOE to "[s]upervise and facilitate the work and research on energy facility siting applications at the direction of the [council]").[1] The legislature has also created an extensive statutory framework governing the site certificate application process. See ORS 469.330 - 370 (setting out the numerous steps in the certificate application process).
**374 This case involves the process for amending a site certificate after a certificate holder already has completed that extensive application process and received a site certificate. In contrast to the detailed statutory framework governing the site certificate application process, the statutory provisions for amending a site certificate are brief. We discuss those provisions below. Because of the limited statutory direction, the council created the process for amending a site certificate through its administrative rules. See ORS 469.470(2) (authorizing the council to "adopt standards and rules to perform the functions vested by law in the council"). Those rules appear in chapter 345, division 27, of the Oregon Administrative Rules.
In January 2017, after years of considering changes, the council began the formal process to modify its rules that govern amending a site certificate and proposed what the council called a "wholesale re-write" of division 27. The council continued its rulemaking activities until October 2017, when the council adopted new rules. Over the course of that time, the council issued six public notices about the rulemaking process, extended the comment period four times, held three public hearings, circulated three draft versions of the proposed rules, and considered more than 150 written comments.
We detail below the procedural steps in the rulemaking process and the changes to the rules over the three draft versions, as relevant. A brief overview of those changes is helpful as background. Before the revisions, the rules provided for two procedural paths for reviewing requests for amendment (RFAs): a standard process and an expedited process.[2] OAR 345-027-0060, 00070, 0080 (2017). The standard process could also be extended, which was frequently necessary because of the complexity and public interest in site certificate applications. See OAR 345-027-0070(2) (2017) (standards for extended standard process). In the years leading up the rule changes, about 70 percent of RFAs were reviewed under the extended standard process.
**375 The first draft of the proposed rules eliminated the expedited review process and added steps to make the standard process longer (more like the extended standard process) and to allow greater public participation. Among other additions, the proposed rules required staff to prepare a draft proposed order (DPO) recommending that the council grant, deny, or modify the RFA and required a public hearing and comment period on the DPO. Additionally, under the standard process in the proposed new rule, people could request contested case proceedings as they could under the existing rules. The council would evaluate those requests and allow them only if the requests raised a significant issue of law or fact, which was the same standard that the council applied under the then-existing rules.[3] OAR 345-027-0070(7) (2017).
*57 The second draft retained the new standard process and re-inserted an expedited review process, which a certificate holder could request. Staff would initially rule on such a request, based on a nonexclusive list of factors set out in the rules. If staff denied the request, the certificate holder could ask the council to reconsider that decision. Cases reviewed under the expedited process would follow many of the same steps as the proposed new standard process. Notably, however, the expedited process allowed only written comments on the DPO, so no public hearing was required. And the expedited process did not allow interested persons to request a contested case proceeding.
The third draft retained the new standard and new expedited processes and added an even more expedited process. That draft also applied a new naming convention: The standard process was called type A review; the expedited process was called type B review; and the new "truly expedited" process was called type C review. The type C review was intended for a narrow range of amendments. It had fewer steps and much shorter deadlines for decision than the other types of review. ODOE would initially determine whether to process an RFA under type C review. But, before **376 making a final decision on the RFA, the council would have the opportunity to direct an RFA to proceed under type A or type B review.
The council approved the third draft of the proposed rules at its October 2017 meeting. The rules became effective October 24, 2017.
II. DISCUSSION
Petitioners challenge the rules directly in this court under ORS 469.490. Petitioners contend that the rules are invalid because the council adopted them without following the procedures in the Oregon Administrative Procedures Act (APA), ORS 183.310 - 183.750, and because the rules exceed the council's statutory authority. We begin with the procedural objections.
A. Procedural Objections
Petitioners raise three procedural objections. First, petitioners argue that the council violated ORS 183.335 (3)(e)(C) by failing to respond to petitioners' comments recommending other options for achieving the substantive goals of the rulemaking. Second, petitioners argue that the council violated ORS 183.335(2)(d) by failing to provide copies of the rules that they proposed to adopt, amend, or repeal that show all proposed changes to the existing rules. And third, petitioners argue that the council violated ORS 183.335(3)(d) by failing to provide a statement identifying how the council will subsequently determine whether the rules are in fact accomplishing the stated objectives of the rulemaking.
1. Standard of review
The parties dispute what standard this court applies when deciding whether to invalidate rules based on a petitioner's procedural objections. The council argues for a substantial-compliance standard. Under ORS 469.490, "rules adopted by the Energy Facility Siting Council *** shall be adopted in the manner required by ORS chapter 183." And chapter 183 requires only "substantial compliance" with the **377 notice procedures contained in ORS 183.335. Specifically, ORS 183.335(11)(a) provides that "a rule is not valid unless adopted in substantial compliance with the provisions of [ ORS 183.335 ]." Because each of petitioners' procedural objections arises under ORS 183.335, the council urges this court to assess its compliance under that substantial-compliance standard.
Petitioners argue for a strict-compliance standard that, according to petitioners, also stems from ORS 469.490. Under that statute, "[t]he review by the Supreme Court of the validity of any rule adopted by the council shall otherwise be according to ORS 183.400." A subsection of ORS 183.400 governs judicial review of agency rulemaking, directing courts to declare a rule invalid if the rule "[w]as adopted without compliance with applicable rulemaking procedures." ORS 183.400(4)(c). Petitioners characterize that provision as implicitly setting out a strict-compliance standard, which they ask the court to apply instead of the substantial-compliance standard set out in ORS 183.335 (11)(a).
*58 Petitioners' reliance on ORS 183.400(4)(c) begs the question of what an agency must do to comply with applicable rulemaking procedures. At least with regard to the procedures in ORS 183.335, an agency satisfies those statutory requirements by substantially complying with the procedures set out in the statute. In that sense, a rule adopted in substantial compliance with ORS 183.335 is a rule adopted in "compliance with applicable rulemaking procedures."
Consistent with the council's position, this court has previously applied the substantial-compliance standard in reviewing challenges arising under ORS 183.335. In Don't Waste Oregon Com. v. Energy Facility Siting , 320 Or. 132, 881 P.2d 119 (1994), the petitioners argued that the council violated a provision of ORS 183.335 requiring that an agency " 'consider fully any written or oral submission' in a rulemaking." Id. at 146, 881 P.2d 119 (quoting ORS 183.335 (3)(a) ). The petitioners argued that the council failed to comply with that provision because, rather than considering the **378 petitioners' written submissions, the council had considered summaries of the submissions that the hearing officer had prepared.
This court rejected the petitioners' interpretation of that provision and then concluded that, even if that interpretation were correct, the petitioners would lose because ORS 183.335 "requires only 'substantial compliance' with its provisions." Id. (quoting former ORS 183.335(10)(a) (1993), renumbered as ORS 183.335(11)(a) (2003) ). The court noted that "[n]either during the rulemaking hearing nor in their post-hearing brief in the contested case proceeding did [the] petitioners assert that the hearing officer failed to consider fully their testimony or that the hearing officer failed to summarize their testimony accurately in his written and oral reports to [the council]." Id. at 147, 881 P.2d 119. Under those facts, the court held that the petitioners could not "establish that the procedure employed by [the council] failed to comply substantially with the requirement that the agency fully consider petitioners' submissions." Id.
We agree with the council and assess petitioners' procedural objections for the council's substantial compliance with ORS 183.335.
2. Responding to comments recommending options
Petitioners first argue that the amended rules are invalid because the council failed to respond to petitioners' comments recommending other options for achieving the substantive goals of the rulemaking. Under ORS 183.335 (2)(b)(G), an agency's notice of intended action must include a "request for public comment on whether other options should be considered for achieving the rule's substantive goals while reducing the negative economic impact of the rule on business." And under ORS 183.335(3)(e)(C), an agency must "maintain a record of the data or views submitted" during the rulemaking process, including "[a]ny public comment received in response to the request made under subsection (2)(b)(G) of this section and the agency's response to that comment." Petitioners maintain that they submitted comments in response to the request made under subparagraph (2)(b)(G) and that the council failed to respond to those comments, thus invalidating the resulting rules.
**379 Petitioners, however, misunderstand the obligation that subparagraph (3)(e)(C) imposes on an agency. For the reasons we discuss below, we conclude that the terms of that statutory provision impose a recordkeeping obligation only. Thus, if an agency has provided a response to a public comment submitted under subparagraph (2)(b)(G), then the statute requires the agency to "maintain" a record that includes "the agency's response to that comment." But if the agency has not provided a response to such a public comment, the statute does not require the agency to create one.
The fact that the statute imposes only a recordkeeping obligation is clear from both the text of the statute and its context. The provisions on which petitioners rely, paragraph (3)(e), expressly address only recordkeeping:
"(e) An agency that receives data or views concerning proposed rules from interested persons shall maintain a record of *59 the data or views submitted. The record shall contain:
"(A) All written materials submitted to an agency in response to a notice of intent to adopt, amend or repeal a rule.
"(B) A recording or summary of oral submissions received at hearings held for the purpose of receiving those submissions.
"(C) Any public comment received in response to the request made under subsection (2)(b)(G) of this section and the agency's response to that comment.
"(D) Any statements provided by the agency under paragraph (d) of this subsection."
ORS 183.335(3)(e).
Nothing in that text directs an agency to create an agency response to a comment to be included in the required record. Petitioners' argument, instead, rests on the premise that a recordkeeping statute necessarily entails an obligation to create an agency response in the first place. Context, however, precludes that argument in this case. In addition to the requirement on which petitioners rely, paragraph (3)(e) also directs agencies to maintain a record of "[a]ny statements provided by the agency under paragraph (d) of this **380 subsection." ORS 183.335(3)(e)(D). And paragraph (d), which we discuss further below, requires an agency, under certain circumstances, to provide a statement identifying a rule's purpose and how the agency will measure its success. ORS 183.335(3)(d). So the document-creation and recordkeeping requirements appear in separate provisions. If the recordkeeping requirement also entailed a document-creation requirement, then we would not expect the legislature to place them in separate provisions.
The absence of statutory text directing an agency to create a response to public comments made under subparagraph (2)(b)(G) is additional evidence that the legislature did not intend to impose such an obligation. We therefore interpret subparagraph (3)(e)(C) as imposing a recordkeeping requirement only. Because petitioners do not allege that the council failed to comply with that recordkeeping requirement, we conclude that petitioners have not established that the council violated subparagraph (3)(e)(C).
3. Providing copies of proposed rules
Petitioners next argue that the rules are invalid because the council did not timely provide copies of the rules that adequately showed the proposed changes. ORS 183.335 sets out numerous notice requirements related to agency rulemaking. Subsection (1) requires an agency to notify certain people before adopting, amending, or repealing any rules:
"Prior to the adoption, amendment or repeal of any rule, the agency shall give notice of its intended action:
"(a) In the manner established by rule adopted by the agency under ORS 183.341(4), which provides a reasonable opportunity for interested persons to be notified of the agency's proposed action;
"(b) In the bulletin referred to in ORS 183.360 at least 21 days prior to the effective date;
"(c) At least 28 days before the effective date, to persons who have requested notice pursuant to subsection (8) of this section; and **381 "(d) Delivered only by electronic mail, at least 49 days before the effective date, to the persons specified in subsection (15) of this section."
ORS 183.335(1).
Pursuant to that statute, petitioners had requested that the council provide them notice of its "intended action" "prior to the adoption, amendment or repeal" of any council rule. See ORS 183.335(8)(a) ("Any person may request in writing that an agency send to the person copies of the agency's notices of intended action issued under subsection (1) of this section."). Therefore, under paragraph (1)(c), petitioners were entitled to receive a notice at least 28 days before the effective date of any proposed rule changes.
Subsection (2) describes the content that the agency must include in or with such a notice of intended rulemaking. In addition to the general notice requirements, one requirement is specific to the notice that an agency must provide to a person who requested notice under subsection (8): the agency must *60 provide a copy of the proposed rules to that person or tell the person how to acquire a copy, and, if the agency is proposing a rule amendment, then the copy of the proposed rule must show all new or deleted material:
"When providing notice of an intended action under subsection (1)(c) of this section, the agency shall provide a copy of the rule that the agency proposes to adopt, amend or repeal, or an explanation of how the person may acquire a copy of the rule. The copy of an amended rule shall show all changes to the rule by striking through material to be deleted and underlining all new material, or by any other method that clearly shows all new and deleted material."
ORS 183.335(2)(d).
In this case, the council was proposing a rule amendment. For that reason, when providing notice under paragraph (1)(c) to persons who had requested it, the council was required to comply with paragraph (2)(d) by showing all new and deleted material with a redlined document or some other method of comparing the proposed amendments to the existing rules. The question that the parties raise is how many times the council was required to comply with that **382 requirement. The council maintains that, because there was only one rule change, it was required to comply with the notice requirements only one time. Petitioners argue that, because the council issued multiple notices, the council was required to comply with the notice requirements each time.
According to the council, it was required to provide a copy of the proposed rules showing all changes when it was required to provide notice of its intended action under paragraph (1)(c). And, the council argues, it was required to provide notice of intended action only once, at some point 28 days before the effective date of the rules. The council contends that it satisfied that requirement when it sent petitioners a notice in January 2017, well in advance of the rules becoming effective in October 2017. That January 2017 notice summarized the changes in the first draft of the proposed rules, including the elimination of the expedited review process; opened a comment period on the proposed rules; scheduled a rulemaking hearing for February 2017; and stated that copies of those rules could be obtained from the council's website and at its office. The notice also indicated that council staff anticipated receiving "comments that raise questions and ideas about how the proposed rules could possibly be revised to allow EFSC to review, under special circumstances, an RFA in an expedited and/or emergency manner rather than the standard review process being proposed." The notice further provided that, because the staff considered expedited and emergency reviews "to be within the scope of this rulemaking notice, EFSC could revise the proposed rules and/or adopt new rules to address these issues as part of this rulemaking."
According to the council, that notice satisfied the requirement under paragraph (1)(c), because it was a notice of intended action that it provided to petitioners more than 28 days before the rules became effective. And the council maintains that it also satisfied paragraph (2)(d) because, not long after circulating the January 2017 notice, the council also made available a redlined document comparing the existing rules to the proposed rules. That document showed proposed deletions in strikethrough and showed proposed additions in underline.
**383 Petitioners do not contend that that January 2017 notice failed to satisfy paragraph (1)(c) or that that redlined document failed to show all new and deleted material that the council was proposing, as needed for that notice to satisfy paragraph (2)(d). Instead, petitioners contend that the council issued five more notices, each of which was, according to petitioners, a new paragraph "(1)(c) notice" that triggered a new obligation under paragraph (2)(d) to show all new and deleted material that the council was proposing compared to the material in the existing rules.
Specifically, petitioners point out that, after holding its February 2017 rulemaking hearing, the council issued a second public notice in March 2017. That notice stated that the council intended to hold another rulemaking hearing and public comment period on a second draft of the proposed rules. At that *61 point, however, the council had not completed the second draft of the rules and had not yet scheduled the second hearing and public comment period.
In April 2017, the council issued a third notice, which summarized the second draft of the proposed rules, including the addition of an expedited review process; scheduled a second rulemaking hearing to take place in May 2017; and extended the public comment period until that date. Not long after circulating the third public notice, the council made available a redlined document comparing the second draft of the proposed rules to the first draft. The council did not, however, provide a redlined document comparing the second draft to the existing rules.
In May 2017, before it held the second rulemaking hearing, the council issued its fourth public notice, which added an additional day to the rulemaking hearing and correspondingly extended the comment period.
In June 2017, the council issued its fifth public notice, which scheduled a third rulemaking hearing for July 2017, and extended the comment period until the close of that hearing. The purpose of that hearing and comment period was to further consider the second draft of the proposed rules.
**384 In August 2017, after the third hearing, the council issued its sixth public notice, which stated that the council intended to create a third draft of the proposed rules to add another review process for "truly expedited situations." At that time, the council had not completed the third version of the proposed rules, but the notice stated that the rules would be complete and available on the council's website on September 8, 2017. The council further extended the written comment period until September 29, 2017, though the council did not hold another rulemaking hearing. Consistent with that notice, on September 8, the council made available a copy of the third draft of the proposed rules, including a redlined document comparing the third draft to the second draft. The council did not, however, provide a redlined document comparing the third draft to the existing rules. The council later made available a redlined document comparing the third draft to the existing rules on October 9, 2017, which was 10 days before the council meeting approving the amended rules and 15 days before the rules became effective.
Each of those notices, like the first one in January 2017, stated that a copy of the proposed amended rules could be obtained from the council's website and at its office. Petitioners complain, however, that the council was required to satisfy paragraph (2)(d) by showing all new or deleted material (compared to the existing rules) each time that it issued the subsequent notices because each of the subsequent notices was a paragraph "(1)(c) notice." Petitioners argue that "the duty to provide a legally sufficient redline draft is triggered *** whenever the agency provides notice under ORS 183.335(1)(c)." And, according to petitioners, the council "provided (1)(c) notices to the public on six different occasions." Petitioners contend that the council did not satisfy paragraph (2)(d) with respect to at least some of the six notices, because some of the notices failed to show all new and deleted material through a redlined document. Specifically, petitioners point out that the redlined documents that the council issued after the first draft of the proposed rules were comparisons between the first and second drafts and then the second and third drafts, rather than comparisons between each draft to the **385 existing rules. And petitioners argue that, by the time the council provided a redlined document comparing the third draft to the existing rules, less than 28 days remained before the effective date of the new rules.
Petitioners' argument rests on the premise that each of the notices subsequent to the initial January 2017 notice was a paragraph "(1)(c) notice." That premise, however, is incorrect because paragraph (1)(c) does not define, or even identify, a particular type of notice. Instead, ORS 183.335(1), quoted above, requires that the agency, "prior to the adoption, amendment, or repeal" of any rule, "shall give notice of its intended action." The text of the statute makes clear that the referent for "intended action" is the "adoption, amendment, of repeal" of a rule. Paragraph (1)(c) simply describes one group of persons who may request that the council give them the notice that is required by *62 ORS 183.335(1). It also specifies when that notice must be given and, in paragraph (2)(d), describes the redlined version of any rules changes that must be provided, as discussed above.
Petitioners do not argue that the notice that the council provided in January 2017 was inadequate to provide notice of the rule amendments that the council eventually adopted in October 2017. That notice informed petitioners (and the public generally) that the council was proposing to "reorganize" and "rewrite" the "rules governing requests for site certificate amendments." It described the rulemaking process, summarized proposed changes to the rules, set a public hearing, and solicited comments on the proposed rules. It also included a redlined document comparing the draft of the proposed rules with the existing rule. Nor do petitioners contend that the council's January 2017 notice was inadequate simply because the council's final October 2017 rule amendments were different from the amendments proposed in the January 2017 notice.[4] Petitioners also do **386 not argue that the council's October 2017 rule amendments were outside the scope of the rulemaking as described in the January 2017 notice. Without such an argument, we presume that the council's January 2017 notice provided sufficient notice of the council's October 2017 rule amendments.
Instead of arguing that the council was required to provide additional notices after the January 2017 notice, petitioners argue only that the council did provide additional notices and that those additional notices failed to comply with the comparison document requirement in paragraph (2)(d). But without some argument as to why the January 2017 notice failed to provide sufficient notice of the council's October 2017 rule amendments, the fact that later notices might not have complied with paragraph (2)(d) is not grounds for concluding that the council failed to comply with the notice requirement.[5] In other words, to invalidate the rules based on the argument that the later notices failed to comply with paragraph (2)(d), petitioners must establish that those later notices were subject to the requirements of paragraph (2)(d). To establish that those later notices were subject to the requirements of paragraph (2)(d), petitioners would have to establish that those notices were required by subsection (1). By not challenging the sufficiency of the January 2017 notice, petitioners have failed to establish that the later notices were required by subsection (1) and, as a result, failed to establish that the later notices were subject to paragraph (2)(d).
**387 It may well have been appropriate for the council to have provided a redlined document that compared each subsequent version of the proposed rules to the then-existing rules, as well as a redlined document comparing the new version to the previous version. But that is not required by the statute in this case. We therefore conclude that the council did not violate ORS 183.335(2)(d).
*63 4. Statement of how to monitor the success of the rules
Petitioners finally argue that the amended rules are invalid because the council failed to comply with ORS 183.335(3)(d), which requires agencies, under certain circumstances, to provide a statement that identifies the objective of the proposed rules and how the agency intends to determine whether the rules accomplish that objective. Specifically, paragraph (3)(d) provides:
"If requested by at least five persons before the earliest date that the rule could become effective after the agency gives notice pursuant to subsection (1) of this section, the agency shall provide a statement that identifies the objective of the rule and a statement of how the agency will subsequently determine whether the rule is in fact accomplishing that objective."
ORS 183.335(3)(d).
The council does not dispute that at least five people requested the statement, thus triggering that statutory obligation.[6] And petitioners do not dispute that the council provided a statement that identifies the objective of the proposed rules-namely, to enhance efficiency and public participation. The only point of dispute is whether the council provided "a statement of how the agency will subsequently determine whether the rule is in fact accomplishing that objective." Id.
The council maintains that it met that standard because, at council hearings, individual members of the **388 council and staff noted the importance of tracking the rules' success and discussed how they might do that. In response to questions from individual council members about tracking the rules' success, staff responded that the council would be able to observe how staff is handling RFAs as they are processed and that, after some period of time, staff could gather input from those affected by the rules and report that input to the council.
Petitioners, however, argue that those discussions are inadequate to satisfy the statute. As an initial matter, petitioners note that, although there were discussions among council members and staff about tracking the success of the rules, no decisions were made and no action taken regarding how the council would determine whether the rules were accomplishing their objective. For example, staff indicated that, if the council wanted staff to gather input from those affected by the rules, then the council should determine when it wanted that to be done and direct the staff to do so. But the council never took action on the issue after those discussions. Further, petitioners contend that, to satisfy the statute, the statement by the council must have been in writing. According to petitioners, oral statements are always insufficient.
One difficulty in evaluating those arguments is that, although the statute directs an agency to provide a statement regarding the objective of the rules and the measurement of their success, the statute does not expressly say to whom the agency must provide that statement, when, or in what manner.[7] Nevertheless, we agree with petitioners *64 **389 that the council never decided how it would track the success of the rules. And we further agree that the statement must be in some storable and retrievable form, whether the statement is in a tangible written document or in some stored version of a writing. As noted above, subparagraph (3)(e)(D) requires an agency to "maintain a record" of "[a]ny statements provided by the agency under" paragraph (3)(d), the provision at issue here. Because the legislature directed agencies to maintain a record of those statements, we can deduce that the legislature intended those statements to be in a form suitable for such a record-namely, in some written form that can be stored and retrieved.[8]
Petitioners are correct that the council failed to provide a statement as to how it intended to determine whether the rules were accomplishing their directives. Under our standard of review discussed above, however, the legal question regarding the validity of the council's rules depends on whether the council substantially complied with the statutory requirement to provide such a statement. We conclude that the council failed to do so.
As this court has previously observed, "The doctrine of substantial compliance has previously been used * * * to avoid the harsh results of insisting on literal compliance with statutory notice provisions where the purpose of these requirements has been met." Brown v. Portland School Dist. #1 , 291 Or. 77, 81, 628 P.2d 1183 (1981) (internal citation omitted). In this case, the purpose of the statutory requirement was not met because the council never decided how it intended track the success of the new rules and, therefore, did not communicate that decision to petitioners. Statements about the importance of tracking the success of the rules and statements discussing possible means for doing so are not sufficient to substantially comply with a **390 requirement that the council actually decide how it intends to track the success of the rules. The council, whether defined as just the council members or as including council staff, adopted no policy and made no decision as to how it would evaluate the success of its new rules and, thus, did not provide a statement reflecting that decision.
Because the council failed to substantially comply with ORS 183.335(3)(d), we conclude that the council's new rules are invalid.
B. Substantive Objections
Although we conclude that the rules are invalid for failing to comply with one of the procedural requirements of the APA, we nevertheless address petitioners' substantive objections so that we may provide appropriate direction to the parties for any future rulemaking regarding the site certificate amendment process.
Under ORS 183.400(4)(b), a rule that "[e]xceeds the statutory authority of the agency" is "invalid." Petitioners contend that the council's new rules exceed its statutory authority in two ways. First, petitioners argue that the rules delegate nondelegable authority to staff to determine whether a site certificate amendment should receive a public hearing and whether any member of the public may request a contested case proceeding. Second, petitioners maintain that the rules improperly limit judicial review of the council's decisions.[9]
1. Delegating authority to staff
Under the amended rules, a site certificate holder may submit an RFA and ask that it be reviewed under the expedited type B review, rather than the standard type A review. And under those rules, staff decides whether the certificate holder can proceed under type B review. If staff concludes that type A review is required, then the certificate holder can ask the council to reverse staff's decision and allow the RFA to be *65 processed under type B review. If staff instead agrees with the certificate holder and concludes that **391 the RFA should be processed under type B review, then the RFA proceeds under type B review.
By rule, the council has provided a nonexclusive list of factors that both the council and staff may consider when deciding whether an RFA should be processed under type A or type B review:
"(a) The complexity of the proposed change;
"(b) The anticipated level of public interest in the proposed change;
"(c) The anticipated level of interest by reviewing agencies;
"(d) The likelihood of significant adverse impact; and
"(e) The type and amount of mitigation, if any."
OAR 345-027-0057(8) (2018).
Petitioners complain that, by giving staff the unreviewable discretion to determine that an RFA should get type B review, the new rules give discretion to staff to determine that there will be no contested case proceeding or public hearing. As petitioners point out, under type A review, there is a public hearing and the public can request a contested case proceeding. But under type B review, there is no public hearing and the public cannot request a contested case proceeding. So, when staff determines that an RFA request should get type B review, staff is determining that there will be no public hearing and that the public cannot request a contested case proceeding.
Petitioners contend that affording such discretion to staff is improper because only the council itself can determine whether there will be a public hearing and whether the public may request a contested case proceeding on an RFA. The problem for petitioners is that no statute requires the council to determine whether there will be a public hearing or whether the public may request a contested case proceeding in the certificate amendment process. Petitioners attempt to get around that by citing the numerous statutes governing the site certificate application process. According to petitioners, those statutes structuring the **392 initial application process demonstrate that the legislature intended staff to have a merely advisory or ministerial role.
Petitioners, however, never explain why statutes governing the certificate application process should govern the certificate amendment process. The legislature has taken very different approaches to those processes, providing extensive statutes structuring and directing the application process, while providing only limited statutory direction regarding the amendment process.
A closer look at the statutory regimes highlights that contrast. The certificate application process begins with an applicant filing a notice of intent to apply for a site certificate. ORS 469.330(1). Staff issues a project order based on the notice of intent and comments received in response to that notice. ORS 469.330(3). An applicant uses that project order to prepare the site certificate application, which it submits to the council. ORS 469.350(1). Staff reviews the application and feedback from state agencies and local governments and then issues a draft proposed order recommending approval or rejection of the application. ORS 469.370(1). After the council holds a public hearing on the application, staff issues its final proposed order recommending approval or rejection of the application. ORS 469.370(4).
Staff then issues a public notice of the proposed order, which includes a notice of a contested case hearing and the deadline for persons to request to participate as a party in the contested case hearing. Id. Although the council is required to conduct a contested case hearing on site certificate applications, ORS 469.370(5), the council concludes the hearing if no party challenges staff's proposed order, ORS 469.370(6). If a party challenges staff's proposed order, then the council conducts the contested case hearing in accordance with the applicable provisions of the APA. ORS 469.370(5).
Regardless whether a party challenges staff's final proposed order, the council must evaluate each site certificate application according to regulatory standards. See ORS 469.360(1) (requiring council evaluation of applications *66 ); ORS 469.501(1) (requiring council to "adopt standards **393 for the siting, construction, operation and retirement of facilities" and identifying subjects that the standards must address). After completing that evaluation, the council issues a final order either rejecting or approving the site certificate application. ORS 469.370(7). Parties dissatisfied with the council's final order may apply for rehearing, ORS 469.403(1), or seek judicial review, ORS 469.370(8). Standards for judicial review are contained in ORS 469.403.
For some proposed facilities, the applicant may request expedited processing of a site certificate application. ORS 469.370(10) ; ORS 469.373. The council must evaluate each request for expedited review. ORS 469.360(1). Like the normal process for assessing a site certificate application, expedited processing results in a final order by the council either approving or rejecting an application.
In contrast to the detailed statutory framework governing the site certificate application process, the statutory provision regarding the process for amending a site certificate provides:
"A site certificate may be amended with the approval of the Energy Facility Siting Council. The council may establish by rule the type of amendment that must be considered in a contested case proceeding. Judicial review of an amendment to a site certificate shall be as provided in ORS 469.403."
ORS 469.405(1) ; see also ORS 469.405(2) (addressing land use approval of proposed amendments); ORS 469.405(3) (dispensing with the requirement of a site certificate amendment for certain pipelines).
By imposing virtually no statutory procedural requirements on the RFA process, the legislature has allowed the council to develop that process largely as it sees fit. The statutes governing the RFA process require the council itself to approve an amendment, thus precluding the council from delegating that final decision-making authority to staff. ORS 469.405(1). But, unlike the certificate application process, the statutes do not otherwise dictate the allocation of authority between the council and staff.
**394 And, whereas the statutes governing the certificate application process require a public hearing and an opportunity to request a contested case proceeding, the statutes governing the RFA process do not. The most those statutes say on those topics is that the council "may establish by rule the type of amendment" that will require a contested case proceeding. ORS 469.405(1) (emphasis added). At this point, the council has not adopted rules requiring any types of RFAs to be subject to contested case proceedings. Ultimately, because the council is not required to provide a public hearing and opportunity to request contested case proceedings in the first place, petitioners cannot complain when the council makes those steps available on limited terms-namely, when staff determines that an RFA should get a type A review rather than a type B review. We therefore conclude that the council did not exceed its authority when it permitted its staff to determine whether an RFA gets type A or type B review.
2. Judicial review
Petitioners finally contend that the council has adopted rules that improperly limit judicial review of RFAs that received type B review, none of which would have gone through contested case proceedings. The rules state that, when an RFA receives type B review, then the right to seek judicial review is limited to those who provided comments during the council's consideration of an application and only as to issues on which they provided comment:
"[O]nly those persons, including the site certificate holder, who provided written comment by the written comment deadline may seek judicial review as provided in ORS 469.403 and issues eligible for judicial review are limited to the issues raised in that person's written comments."
OAR 345-027-0068(3)(e)(E), OAR 345-027-0072(3)(d), and OAR 345-027-0072(5) (2018).
Petitioners contend that those rules are invalid because, when an RFA does not go through a contested case proceeding, then judicial review should be allowed for any "person adversely affected or aggrieved by *67 the agency order," without limitation. ORS 183.482(2). We agree. **395 The statute governing RFAs provides, "Judicial review of an amendment to a site certificate shall be as provided in ORS 469.403." ORS 469.405(1). That statute, ORS 469.403, has a subsection expressly addressing judicial review of RFAs that went through contested case proceedings:
"Any party to a contested case proceeding on a site certificate or amended site certificate application may appeal the council's approval or rejection of the site certificate or amended site certificate application. Issues on appeal shall be limited to those raised by the parties to the contested case proceeding before the council."
ORS 469.403(2) (emphasis added).
The statute, however, does not have a provision addressing RFAs that did not go through contested case proceedings. The statute instead notes that, "[e]xcept as otherwise provided in ORS 469.320 and this section, the review by the Supreme Court shall be the same as the review by the Court of Appeals described in ORS 183.482." ORS 469.403(6). And ORS 183.482 allows a petition for review to be filed by, among others, "a person adversely affected or aggrieved by the agency order." ORS 183.482(2). The challenged rules are improperly narrow, petitioners assert, because someone might be affected or aggrieved by an amended site certificate, and thus have standing to seek judicial review, even if the person did not provide comments to the council.
The council argues in response that it would not make sense for the legislature to provide for limited judicial review in contested cases and broader judicial review in noncontested cases. Thus, the council argues, the more restricted review provided for noncontested cases is sufficient. The council might be correct in its view of the kinds of cases where judicial review is less likely to be sought, and perhaps the legislature failed to notice the different paths for judicial review that it set out. But without some grounding in the statutory text, context, or legislative history, the council's argument must fail. We therefore conclude that OAR 345-027-0068(3)(e)(E), OAR 345-027-0072(3)(d), and OAR 345-027-0072(5) exceed the council's statutory authority.
**396 III. CONCLUSION
In sum, we conclude that, as a procedural matter, the council failed to comply in ORS 183.335(3)(d), because it did not issue a statement identifying how it would later determine whether the proposed rules were accomplishing their objective. We further conclude that, as a substantive matter, OAR 345-027-0068(3)(e)(E), OAR 345-027-0072(3)(d), and OAR 345-027-0072(5) exceed the council's statutory authority regarding the scope of judicial review.
The rules approved by the Energy Facility Siting Council through Permanent Administrative Orders EFSC 4-2017 and EFSC 5-2017 are invalid.

Throughout the opinion, we use the term "staff" to refer to the ODOE-provided staff that supports the council.

The rules also provided for a process limited to amending a site certificate when transferring the ownership of a facility. The council did not make material changes to that process, so the specifics of it are not relevant to this case.

According to the record, "there has never been a contested case in the review process for a request for amendment," because, when such a request has been made, the council has determined that the request failed to "meet the threshold criteria."

In 1976, the Court of Appeals held that an agency is not required to provide additional notice every time it considers adopting changes to the text proposed in a notice of intended rulemaking:
"The purpose of the notice requirement for rulemaking is twofold. It serves to inform the interested public about intended agency action. It triggers the opportunity for an agency to receive the benefit of the thinking of the public on the matters being considered. The notice requirement contemplates that an agency may often desire to alter a proposed rule after receiving public comment. To require, as petitioner would apparently have us do, that any modification of a proposed rule after hearing necessitates still another notice and another hearing would produce an unwieldy procedure and also might well result in either hearing after hearing or an agency reluctant to change a single word of its original proposals no matter how persuasive the arguments for change offered at the hearing."
Bassett v. Fish and Wildlife Comm. , 27 Or App 639, 642, 556 P.2d 1382 (1976). Petitioners emphasize that they do not challenge that decision.

We also note that the proposed rule amendments went through several iterations and that it was not unreasonable for the council to assist the public and staff in tracking those changes by providing redlined documents that compared each subsequent revision of the proposed rules to the version that preceded it. Additionally, persons who closely followed this rulemaking process would have been able to compare the successive versions of the proposed rules and to have reviewed the changes from the then-existing rules to each subsequent version of the proposed rules, although we agree with petitioners that that task may have been difficult.

An agency must respond to requests made under paragraph (3)(d) only if the request is timely, which the statute defines as a request made "before the earliest date that the rule could become effective after the agency gives notice pursuant to subsection (1)." ORS 183.335(3)(d). The council does not challenge the timeliness of petitioners' request. We therefore do not consider that issue.

The Department of Justice's uniform and model administrative rules add that the agency must provide the statement to those who requested it, within 10 days of receiving the request, and in writing:
"(1) A request for a statement of the agency's objective in proposing a rule must be submitted in writing and must identify the persons on whose behalf the request is made.
"(2) Within ten days of receiving a request or requests for a statement of objective from at least five persons, the agency shall provide the statement, in writing, to the person or persons who submitted written requests. Failure to meet this deadline shall not affect the validity of any rule.
"(3) The agency's written statement of the objective of the rule must include an explanation of how the agency will determine whether the rule accomplishes its objective."
OAR 137-001-0095. The council has adopted that model rule. See OAR 345-001-0005(1) (noting that, among other model rules, the council adopted "OAR 137-001-0005 through 137-001-0100").

The Uniform Commercial Code helpfully defines "record" as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." UCC § 1-201(b)(31) ; ORS 71.2010(2)(ee).

The council does not contend that it is entitled to deference in the interpretation of the relevant authorizing statute.