DeVORE, P. J.
Petitioner receives medical assistance as a member of the Oregon Health Plan (OHP). She seeks judicial review after the agency that administers the plan, the Division of Medical Assistance Programs (DMAP) of the Oregon Health Authority (OHA), denied her physician's request for prior authorization of treatment for her medical condition. The dispute involves a list of conditions and treatments-the Prioritized List of Health Services-that the agency uses to determine what medical services that the plan covers. OHP members are eligible to receive treatments for conditions when the condition and treatment are paired on that list and appear above a chosen funding line. This dispute arises because petitioner's condition and treatment appear separately on the Prioritized List and not paired together above the funded line. On review, we conclude that, in that circumstance, DMAP must apply OAR 410-141-0480(10), which may require DMAP to make an ad hoc coverage decision. Because we cannot determine that DMAP considered or applied that rule, we reverse and remand.
Before summarizing the facts, we must sketch the regulatory landscape. The OHP is Oregon's Medicaid program, which provides health care assistance to qualifying residents. In the administration of the plan, the Health Evidence Review Commission ("HERC") creates and maintains a list of health conditions paired with treatments for those conditions-the "Prioritized List of Health Services." HERC ranks the condition/treatment pairs on the Prioritized List in order of importance, based on the clinical and cost effectiveness of services. The Oregon legislature then draws a "funded line" on the Prioritized List.
Generally speaking, OAR 410-141-0480 ties coverage under the OHP to whether conditions and treatments are paired above or below the funded line on the Prioritized List. Specifically, OAR 410-141-0480(1) provides:
"Division members are eligible to receive, subject to section (11) of this rule [regarding services excluded under OAR 410-141-0500 ], those treatments for the condition/ treatment pairs funded on the Health Evidence Review
Commission (HERC) Prioritized List of Health Services adopted under OAR 410-141-0520 when such treatments are medically or dentally appropriate, except that services shall also meet the prudent layperson standard defined in 410-141-0140. Refer to 410-141-0520 for funded line coverage information."
The cross-referenced exclusions from services, set forth in OAR 410-141-0500(1)(c), include, among others, "[a]ny treatment, service, or item for a condition that is not included on the funded lines of the Prioritized List of Health Services except as specified in OAR 410-141-0480, OHP Benefit Package of *375 Covered Services, subsection (8) [co-morbid conditions]."
The facts are essentially uncontested. Petitioner is enrolled with Western Oregon Advanced Health (WOAH), a coordinated care organization that has contracted with DMAP to provide medical services to members when covered and medically appropriate.[1] In 2011, petitioner twice sought emergency medical care for leg pain. In October 2014, her physician diagnosed severe, symptomatic varicose veins and referred her to a vascular surgeon. In February 2015, a vascular surgeon proposed endovenous laser ablation of the great saphenous vein of her right leg. He submitted a prior authorization request form to WOAH, in which he identified petitioner's condition as varicose veins with inflammation in the lower extremities, designated as a condition code ICD-9 454.1, to be treated with ablation therapy, designated as treatment code CPT 36478.
At the time of the physician's request, petitioner's condition-varicose veins with inflammation-appeared on line 209 of the Prioritized List, which is above the funded line, but the proposed treatment-ablation-appeared on lines 525 and 648, in the unfunded part of the list, paired
with conditions other than varicose veins. For that reason, WOAH denied the request, explaining that OHP "covers certain medical treatments for specific health conditions" and that the "treatment that was requested is not funded for [petitioner's] health condition under the [OHP]."
Petitioner sought administrative review of the denial, and DMAP referred the hearing request to an administrative law judge (ALJ). DMAP, in defense of WOAH's denial, contended that only those condition/treatment pairs above the funding line are covered under the OHP. Petitioner saw things differently. She argued that, at the time of her request, HERC simply had "not assessed the need of this treatment for this condition under the current prioritized list," and, as a result, the determination of coverage should be determined solely by the terms of an administrative rule governing prior authorization: OAR 410-130-0200. Petitioner recited that, under subsection (4) of that rule, "Codes for which medical need has not been specified by the HERC shall be authorized based on medical appropriateness as the term is defined in OAR 410-120-0000." OAR 410-130-0200(4). In petitioner's view, medical appropriateness-not funding line placement-should be the sole determinant of coverage when the condition and treatment do not appear as a pair on the Prioritized List.
The ALJ agreed with DMAP's argument that, in the absence of a matched pair of codes for the condition and treatment, the proposed treatment was implicitly excluded from coverage as a matter of law without any further consideration. The ALJ explained:
"Because the codes appear on the Prioritized List, it is reasonable to infer that HERC did consider both diagnosis code 454.1 and procedure code 36478 for the Prioritized List in effect at the time of the denials. However, because the codes did not pair on any line of the Prioritized List, it is reasonable to infer that HERC had determined that the procedure was not medically appropriate for that diagnosis. It does not follow that, simply because the diagnosis and procedure codes were not paired on the Prioritized List, HERC did not consider medical need as related to these two codes."
(Emphasis added.) Based on that interpretative inference, the ALJ sustained WOAH's denial of petitioner's request. Petitioner sought reconsideration before the agency itself. DMAP denied reconsideration, effectively adhering to the ALJ's view that petitioner is eligible to receive only treatment that has been paired with her funded condition, and not the requested ablation treatment.
Thereafter, petitioner sought judicial review in this court. The parties continue to *376 disagree over how OAR 410-141-0480 addresses coverage for treatments and conditions that are not paired above the funding line. On review, the parties have focused, after supplemental briefing, on another subsection of that rule-subsection (10)-that provides critical context for the ALJ's interpretation that unpaired codes on the Prioritized List meant that such treatments are automatically excluded from coverage. Considering subsection (10), we conclude that the ALJ's proposed interpretation cannot be squared with the text and context of the rule, and, as a consequence, DMAP should be required to consider and apply subsection (10) under a correct interpretation of that rule. ORS 183.482(8)(a). To explain, we return to the regulatory structure.
As suggested above, OAR 410-141-0480(1) is the heart of the OHP. That rule provides that, subject to the exclusion of services under OAR 410-141-0500, members are eligible for "those treatments for the condition/treatment pairs funded on the Health Evidence Review Commission (HERC) Prioritized List of Health Services adopted under OAR 410-141-0520 when such treatments are medically or dentally appropriate." The cross-referenced rule on exclusions, OAR 410-141-0500, provides:
"(1) The following services are excluded:
"(a) Any service or item identified in OAR 410-120-1200 and 410-120-1210, Excluded Services and Limitations. * * *
"* * * * *
"(c) Any treatment, service, or item for a condition that is not included on the funded lines of the Prioritized List of Health Services except as specified in OAR 410-141-0480,
OHP Benefit Package of Covered Services, subsection (8) [co-morbid conditions]."
(Emphasis added).[2]
Based on those two provisions- OAR 410-141-0480(1) and OAR 410-141-0500(1) -the ALJ inferred that, if HERC recognized a condition, such as varicose veins with inflammation, but did not pair that condition with petitioner's requested treatment, ablation, then HERC had necessarily considered that treatment but rejected it. In DMAP's view, the appearance of a treatment code alone, when paired with some other condition, indicates a denial of coverage, without any further consideration of petitioner's requested treatment of her condition. The difficulty with the "inferential" reasoning of the ALJ and DMAP is it appears to be based narrowly on only those cited provisions. That is, the record does not reflect whether the ALJ and DMAP considered all provisions of OAR 410-141-0480, when interpreting that rule to mean that any condition and treatment that is not perfectly paired is necessarily excluded from coverage without any further consideration.
The same rule that provides in OAR 410-141-0480(1) that the OHP will provide treatments "for the condition/treatment pairs funded" on the Prioritized List also addresses the situation in which a condition/treatment pair is not on the list. Consequently, the interpretation of the rule does not depend on a legal "inference" about what HERC may have
thought about a situation in which a matched condition and treatment did not appear on the list. We need only continue reading through to OAR 410-141-0480(10), which addresses the situation in which a *377 condition/treatment pair is not on the list.[3] That subsection provides:
"If a condition/treatment pair is not on the HERC Prioritized List of Health Services and the Division determines the condition/treatment pair has not been identified by the HERC for inclusion on the list, the Division shall make a coverage decision in consultation with the HERC."
(Emphasis added.) The first and last clauses are sufficiently explicit so as to permit two significant observations to be made.
First, the opening reference to a "condition/treatment pair" plainly refers to a condition and to a treatment as a pair in relation to each other. When a particular condition/treatment pair does not appear on the list, DMAP may be required to make a "coverage decision." Second, when subsection (10) refers to a "coverage decision," that "coverage decision" necessarily refers to the exercise of judgment that DMAP is required to make as to coverage regarding an individual member's claim. A judgment must be made by DMAP because there is no rule addressing that particular condition/treatment pair on the funded or unfunded sides of the Prioritized List. Because it is a "coverage decision," it is, by its nature, an ad hoc decision about "coverage" for an individual claim.[4]
With those observations made, we reject the extreme of each party's arguments in turn. DMAP first argues that OAR 410-141-0480(10) should not apply because the condition and treatment codes at issue here do appear on the Prioritized List, albeit on separate lines. That rationale is contrary to the plain text of subsection (10), which refers to the absence of a matched "condition/treatment pair " on the list. The appearance of the treatment code alone, matched with other conditions, does not require a rejection of coverage without any further consideration. Rather, OAR 410-141-0480(10) presents the possibility of a "coverage decision."
Next, DMAP contends that it did what subsection (10) required, because DMAP consulted with HERC, "even though it was not required to do so." Sometime after petitioner's request, HERC amended the Prioritized List to expressly pair the condition/treatment pair at issue here while placing that pair below the funded line. That amendment, however, became effective after petitioner's request, and DMAP has not contended that that subsequent rule amendment was intended to govern this claim. More importantly, that amendment does not do all that subsection (10) requires. Subsection (10) does not concern just updating the Prioritized List as a matter of rulemaking for future cases. When its prerequisites are satisfied, subsection (10) requires that DMAP make an ad hoc "coverage decision" with regard to the specific claimant's request.
At the same time, we reject petitioner's implicit assumption that OAR 410-141-0480(10) plays no role in the determination of coverage as a preliminary matter. Contrary to her argument that "medical appropriateness" is the sole determinant of coverage, the term "medical appropriateness," as might concern a particular situation, does not even appear in OAR 410-141-0480(10). In its component parts, OAR 410-141-0480 is a rule about the general conditions that coalesce to *378 create coverage, while, generally speaking, medical appropriateness is an additional requirement for a particular situation in which there otherwise is coverage. See OAR 410-120-1200(2)(b) (requiring medical appropriateness for
covered services); OAR 410-141-0480(1) (same). Under OAR 410-141-0480(10), the fact that a "coverage decision" is a "coverage" matter is underscored by the requirement that DMAP make its decision "in consultation with the HERC." By so providing, subsection (10) contemplates a decision that is to be made consistently with the considerations embodied in HERC's development of the Prioritized List. Those policy-type considerations on a general level do not involve the medical appropriateness of a treatment in a particular patient's circumstances.[5]
In sum, petitioner's entitlement to coverage, if any, depends upon the application of OAR 410-141-0480(10), but the record does not show that the provision has been considered, that both prerequisites to a "coverage decision" have been addressed, and, if those prerequisites are satisfied, what a "coverage decision" under that provision would be. For that reason, we remand the case for further proceedings. See Vermeulen v. Dept. of Human Services , 231 Or.App. 410, 418, 220 P.3d 93 (2009) (remanding for reconsideration under a correct interpretation of the law where the ALJ's "reasoning cannot be squared with the wording of the administrative rule").
Reversed and remanded.

A coordinated care organization (CCO) is a corporation, governmental agency, public corporation, or other legal entity that is certified by the OHA to be accountable for care management and coordinated health care for its members. OAR 410-141-0000(13) (CCO defined). In providing coordinated care, a CCO operates under standards set by statute and administrative rule. See ORS 414.625 (OHA to establish rules for coordinated care organizations); OAR 410-136-3010 (OHA contracts with coordinated care organizations to provide coordinated care services across physical health, dental health, and non-emergent medical transportation).

In harmony with OAR 410-141-0480, which promises payment for funded condition/treatment pairs when medically appropriate, OAR 410-120-1200(2) provides:
"The Division of Medical Assistance Programs (Division) shall make no payment for any expense incurred for any of the following services or items that are:
"* * * * *
"(b) Determined not medically or dentally appropriate by Division staff or authorized representatives * * *."
Thus, generally speaking, the issue of medical appropriateness is a separate and additional requirement for treatment-treatment that otherwise is covered. As provided in OAR 410-120-0000(139), " 'Medically Appropriate' means services and medical supplies that are required for prevention, diagnosis, or treatment of a health condition that encompasses physical or mental conditions or injuries" and, among other things, are "[n]ot solely for the convenience of an OHP client" and are "[t]he most cost effective of the alternative levels of medical services or medical supplies that can be safely provided * * *."

We consider subsection (10) of the rule notwithstanding DMAP's contention that petitioner, by not referring to that subsection earlier, failed to preserve the issue for review. The preservation argument is unpersuasive-most importantly, because OAR 410-141-0480(10) is necessary context for considering the meaning of OAR 480-141-0480(1). DMAP itself broached OAR 410-141-0480(10) in its respondent's brief, and we invited supplemental briefing by both parties as to the correct interpretation of the law.

As noted, OAR 410-141-0480(10) includes, as one of two prerequisites to a coverage decision, that "the Division determines the condition/treatment pair has not been identified by the HERC for inclusion on the list." As matters stand, neither party has addressed the applicability of that clause to circumstances at the time of petitioner's request. The parties have not addressed whether the clause refers to condition/treatment pairs rejected in the past, as HERC's historic record may reflect, or to condition/treatment pairs, identified at the time of petitioner's request, that are then pending "for inclusion" in the future. Whatever the meaning of the clause, no evidence was offered about such putative pairing, past or present, at the time of the claim. Thus, it remains for the agency to develop the evidence about, and the meaning of, the clause pertaining to any proposed, relevant pairing of a condition and treatment "for inclusion" on the list.

Moreover, contrary to petitioner's view, the prior authorization rule, OAR 410-130-0200(4), does not make the determination of medical appropriateness, alone, synonymous with the determination of coverage. Assuming arguendo that the prior authorization rule applied, subsection (4), concerning medical appropriateness, does not stand alone. In close proximity, subsection (3) provides that prior authorization is to be allowed or denied "consistent" with HERC's Prioritized List. Thus, the considerations of coverage expressed in the Prioritized List would still apply-just as they do under OAR 410-141-0480(10) anyway.