272 November 20, 2024 No. 830

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

SILETZ ANGLERS ASSOCIATION,
an Oregon non-profit corporation;
Oregon Rod Reel & Tackle; Scott Amerman;
Grant Scheele; Mike Kelly; and Port of Siuslaw,
a publicly chartered special district,
*Petitioners,*

*v.*

FISH AND WILDLIFE COMMISSION
and the DEPARTMENT OF FISH AND WILDLIFE,
an agency of the State of Oregon,
*Respondents.*

Department of Fish and Wildlife
A181877

Argued and submitted October 15, 2024.

Dominic M. Carollo argued the cause for petitioners. Also on the briefs were Nolan G Smith and Carollo Law Group, LLC.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondents. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Kamins, Judge, and Kistler, Senior Judge.

KAMINS, J.

Rules held valid.

**KAMINS, J.**

In this rule challenge under ORS 183.400, petitioners challenge the validity of two temporary administrative rules adopted by the State Department of Fish and Wildlife (ODFW)[1]—OAR 635-014-0090 (July 1, 2023) and OAR 635-016-0090 (July 1, 2023)—which "modif[ied] bag limits, close[d] salmon fishing, and implement[ed] other conservation measures for protection of wild Chinook in specified Oregon coastal rivers."[2] Those temporary rules expired on December 7, 2023.

As described in more detail below, in three assignments of error, petitioners assert that we should hold that the temporary rules were invalid because they were "a stark and arbitrary departure from ODFW's Oregon Coastal Multi-Species Conservation and Management Plan ('CMP'), ODFW failed to follow rulemaking procedures, the rules were inconsistent with ODFW's statutory and regulatory authority, and [the rules] violate[d] the Oregon Constitution's separation of powers doctrine." ODFW responds that we should dismiss the petition for judicial review as moot, and further asserts that the temporary rules were valid.

---

[1] The State Department of Fish and Wildlife is a department established under the State Fish and Wildlife Commission. ORS 496.080. Petitioners' briefing refers to the State Department of Fish and Wildlife and the State Fish and Wildlife Commission collectively as "ODFW," and we adopt the same convention in this opinion.

[2] OAR 635-014-0090 (July 1, 2023) provided, for example:

"(2) The following regulations apply in the Alsea River and bay and Drift Creek:

"(a) The daily adult wild Chinook bag limit is two fish in aggregate; and

"(b) No more than ten adult wild Chinook may be retained for the period in aggregate.

"(3) Effective October 1 through December 31, Big Creek (Clatsop) is open for retention of hatchery steelhead and hatchery Chinook."

OAR 635-016-0090 (July 1, 2023) provided, for example:

"(3) Effective July 1 through December 31, the following regulations apply in the Coos River, Coos Bay, South Fork Coos River, and Millicoma mainstem:

"(a) The daily adult wild Chinook bag limit is two fish in aggregate; and

"(b) No more than ten adult wild Chinook may be retained for the period in aggregate.

"(4) Effective July 1 through December 31, the Coquille River and South Fork Coquille is closed to angling for and retention of all Chinook."

For the reasons below, we conclude that petitioners' challenge to the temporary rules is moot, but we exercise our discretion to reach the merits of petitioners' rule challenge. As to the merits of petitioners' challenge, we hold that the temporary rules were valid.

## I.   BACKGROUND

### A.   *ODFW's Statutory Charge and the CMP*

It is the policy of the State of Oregon that "wildlife shall be managed to prevent serious depletion of any indigenous species and to provide the optimum recreational and aesthetic benefits for present and future generations of the citizens of this state." ORS 496.012. In furtherance of that policy, the legislature has charged ODFW with representing "the public interest" and implementing certain "coequal goals of wildlife management" that the legislature has specified.[3] *Id.* With regard to salmon in particular, ORS 496.435 provides that "it is declared to be a goal of the people of the State of Oregon to achieve recovery and sustainability of native stocks of salmon."

In fulfilling its statutory duties, ORS 496.162 requires that ODFW conduct an investigation into the "supply and condition of wildlife" and adopt rules for the taking of such wildlife, providing, in relevant part:

"(1)   After investigation of the supply and condition of wildlife, the State Fish and Wildlife Commission, at appropriate times each year, shall by rule:

---

[3] Those goals are:

"(1)  To maintain all species of wildlife at optimum levels.

"(2)  To develop and manage the lands and waters of this state in a manner that will enhance the production and public enjoyment of wildlife.

"(3)  To permit an orderly and equitable utilization of available wildlife.

"(4)  To develop and maintain public access to the lands and waters of the state and the wildlife resources thereon.

"(5)  To regulate wildlife populations and the public enjoyment of wildlife in a manner that is compatible with primary uses of the lands and waters of the state.

"(6)  To provide optimum recreational benefits.

"(7)  To make decisions that affect wildlife resources of the state for the benefit of the wildlife resources and to make decisions that allow for the best social, economic and recreational utilization of wildlife resources by all user groups."

"(a)   Prescribe the times, places and manner in which wildlife may be taken by angling, hunting, trapping or other method and the amounts of each of those wildlife species that may be taken and possessed."

To "ensure the conservation and recovery of native fish in Oregon," ODFW has adopted a "Native Fish Conservation Policy." OAR 635-007-0502(1). That policy is implemented, at least primarily, through "conservation plans." OAR 635-007-0502(4); OAR 635-007-0505(1). The CMP—which petitioners contend the temporary rules were a "stark and arbitrary departure from"—is such a conservation plan.

Specifically, the CMP "implements the State's strategy for protecting, enhancing and utilizing Oregon populations of Chinook salmon, spring Chinook salmon, chum salmon, winter steelhead, summer steelhead, and coastal cutthroat trout along the Oregon coast." OAR 635-500-6775(1). At bottom, as described in the CMP itself, the CMP is a document that is intended to be "used by anglers, conservation groups, watershed councils, government agencies, landowners and the general public to understand how salmon, steelhead, and trout within the Coastal planning area are being managed, what the long-term goals are for them, and what actions need to be taken to achieve those goals." Among other information, the CMP "contain[s] factual background material, statements of the rationale for selection of objectives, strategies to be applied to attain objectives, and statements of general priorities for various actions." OAR 635-500-0002.

The CMP is not intended to be static: Rather, as also set forth in the CMP itself, it is a "dynamic document that will be modified over time in response to learning from monitoring data and implementation experience." So, although it aims to provide "relative management certainty for hatchery programs and harvest options until re-assessment [] in [2026]," it is also "intended to be a living document that evolves as more is learned about the fish and the effectiveness of the strategies outlined in the plan for improving the health of the [Species Management Units] and the fishery opportunities they provide."

Further, the CMP is not a statute nor an administrative rule.[4] And, indeed, ODFW's administrative rules provide that it is the administrative rules themselves that are the "legally enforceable elements of fish management plans." OAR 635-500-0002 ("[T]he administrative rules contained in [Division 500] are the legally enforceable elements of fish management plans.").

B.  *ODFW's Adoption of the Temporary Rules*

In 2022, ODFW adopted sport fishing rules for 2023 that were effective as of January 1, 2023. On July 1, 2023, ODFW amended two rules regulating fishing—OAR 635-014-0090 and OAR 635-016-0090. The temporary administrative order amending the two rules explained that the amended rules would "modify bag limits, close salmon fishing, and implement other conservation measures for protection of wild Chinook in specified Oregon coastal rivers during various time periods between July 1 and December 31 in the Northwest and Southwest Zones." And the temporary rules themselves provided that they "superseded the 2023 Oregon Sport Fishing regulations pamphlet" to the "extent of any inconsistency."

The temporary administrative order adopting the temporary rules explained why, in ODFW's view, the temporary rules were needed as a conservation measure:

"Returns of wild Chinook have been at or below critical abundance[5] in several coastal basins during the past several years. Additionally, freshwater harvest rates have been increasing over time. Although the forecasts indicate an improved return relative to 2022, the rapidly changing environmental conditions increase uncertainty in the forecasts. These modifications to the rules are needed to

---

[4]  In this rule challenge, ODFW takes the position that the CMP itself is not an administrative "rule" under the Administrative Procedures Act. *See* ORS 183.310(9) ("'Rule' means any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency."). Likewise, we do not understand petitioners to contend that the CMP is a rule under the Administrative Procedures Act.

[5]  "Critical abundance" is defined in the CMP to mean a "historically low wild spawner abundance below which long-term persistence becomes uncertain and at which no harvest will be allowed within a population if this level is reached in two successive years[.]"

protect wild Chinook by increasing the likelihood that runs will remain above critical abundance by reducing angler impacts on that species."

The temporary administrative order also included a "prejudice statement" explaining why ODFW utilized the temporary rulemaking process rather than the permanent rulemaking process, which would have required ODFW to go through the preadoption notice and comment process that is applicable to permanent rules under the Administrative Procedures Act.[6] Specifically, that statement highlighted, among other points, ODFW's determinations that returns of wild Chinook salmon had been at or below "critical abundance in several coastal basins" in the recent past, that there had been an increase in freshwater harvest rates of salmon, that environmental conditions had caused ODFW's forecasts to become more uncertain, and that there was inadequate time to go through permanent rulemaking proceedings because the Chinook were expected to "imminently" return to freshwater:

> "The Department finds that its failure to act promptly will result in serious prejudice to the public interest because there is a substantial likelihood that absent immediate implementation of conservation measures wild Chinook may be adversely affected (i.e., overharvested), which could be avoided or reduced if the rule modifications were effective immediately. For example, as part of adaptive management, the Department's monitoring indicates that returns of wild Chinook have been at or below critical abundance in several coastal basins over the past several years and that freshwater harvest rates have been increasing. Additionally, there is increased uncertainty in forecasts as a result of changes in the environment. These latter two factors have resulted in populations falling below critical abundance on some occasions. Therefore, protective measures are necessary to prevent serious depletion of wild Chinook and also to provide the optimum recreational and aesthetic benefits for present and future generations of the citizens of this state. There is not adequate time to go through permanent rulemaking proceedings to modify

---

[6] We note that although ODFW did not go through the notice and comment period applicable to permanent rules, it did solicit feedback and comments from stakeholders before adopting the temporary rules. Specifically, it asked for survey feedback about two different bag limits for fall Chinook in certain rivers before it adopted the temporary rules; over 700 people responded to the survey.

these fisheries to protect the wild Chinook as the species are expected to imminently return to freshwater.

"Failure to immediately adopt these rules will also cause serious prejudice to the anglers in the Northwest and Southwest Zones because absent immediate implementation of the specified conservation measure harvest of Chinook under existing rules will further deplete these wild Chinook returns which would likely result in greater harvest restrictions in the future necessary to rebuild runs."

The rulemaking record for the two temporary rules that petitioners challenge contains press releases that further explain ODFW's reason for adopting the temporary rules, and ODFW's need to depart from the permanent rules that it had adopted in 2022. One of those press releases detailed ODFW's ongoing concerns about Chinook populations, and noted specific environmental issues that ODFW considered in determining that adopting the temporary rules was necessary, such as "drought, heat domes, non-native predator expansions, wildfires, and marine heatwaves":

"Despite some improved forecasts for wild Chinook this year, fishery managers have ongoing concerns about coastal Chinook populations. This is due to a number of factors, including: multiple recent years of critically low returns in some basins, long-term declines in Chinook returns to some rivers, and region-wide trends that have resulted in Chinook fishing restrictions and closures in recent years from California to Alaska. New and rapid changes in the freshwater and ocean environment resulting in drought, heat domes, non-native predator expansions, wildfires, and marine heatwaves have also increased the risk of forecast inaccuracy and potential overharvest.

"Due to these concerns, ODFW is recommending reduced bag limits to ensure populations stay above critical abundance and avoid future closures. Each river will have its own bag limit meaning aggregate bag limits (one bag limit for multiple rivers in an area) would no longer be in effect for wild Chinook. Rivers within a stratum are not showing the same trends anymore, so a river-specific approach is more appropriate."

The rulemaking record also contains a copy of the CMP itself.

## II.  MOOTNESS

Before turning to the merits of petitioners' arguments, we must address the threshold issue of mootness.

Petitioners and ODFW agree that because the temporary rules have expired, petitioners' challenge to the temporary rules under ORS 183.400 is moot. Additionally, as we understand it, petitioners and ODFW agree that petitioners' challenge meets the criteria set forth in ORS 14.175, which allows this court, in certain circumstances, to exercise its discretion to decide moot cases.

We agree with the parties both that petitioners' challenge is moot and that it meets the criteria set forth in ORS 14.175. *See Mooney v. Oregon Health Authority*, 314 Or App 809, 811, 500 P3d 79 (2021) ("We long have held that the repeal or replacement of an administrative rule means an ORS 183.400 challenge seeking to invalidate the displaced rule is moot."); ORS 14.175 (providing that this court can decide cases that are moot when, among other facts, "the party had standing to commence the action," and "the act challenged by the party is capable of repetition" and is "likely to evade judicial review"). Consequently, whether we decide the merits of this rule challenge is within our discretion. *Progressive Party of Oregon v. Atkins*, 276 Or App 700, 707, 370 P3d 506, *rev den*, 360 Or 697 (2016) (courts retain judicial discretion to either decide or dismiss moot cases).

In determining whether to exercise our discretion to decide a moot matter under ORS 14.175, we consider, among other factors, "the adversarial nature of the parties' interests, the effect of the decision on both the parties and others not before the court, judicial economy, and the extent of the public importance of the issues presented." *Eastern Oregon Mining Assoc. v. DEQ*, 285 Or App 821, 830, 398 P3d 449 (2017), *aff'd*, 365 Or 313, 445 P3d 251 (2019), *cert den*, ___ US ___, 141 S Ct 111 (2020).

Here, petitioners' interests, at least as conceived of by petitioners, remain adverse to ODFW's interests. Further, the issues raised in this case—*e.g.*, ODFW's authority to adopt temporary rules related to fisheries, what ODFW must do prior to adopting such rules, and whether ODFW's process

for temporary rulemaking violates "the Oregon Constitution's separation of powers doctrine"—has broader relevance than just this case, and we think they are issues of significant public importance. *See Sarepta Therapeutics, Inc. v. Oregon Health Authority*, 325 Or App 480, 485, 530 P3d 103, *rev den*, 371 Or 333 (2023) (exercising discretion to consider moot rule challenge under ORS 14.175 where issues had "broader relevance than just this case"). Further, ODFW frequently utilizes temporary rulemaking to regulate the taking of fish. *See, e.g.*, Temporary Administrative Order, OAR 635-016-0090 (Jan 14, 2022); Temporary Administrative Order, OAR 635-016-0090 (Jan 15, 2020); Temporary Administrative Order, OAR 635-014-0090 (Apr 23, 2020); Temporary Administrative Order, OAR 635-014-0090 (July 28, 2020).

For those reasons, we exercise our discretion to reach the merits of petitioners' challenge to the temporary rules.

### III.   PETITIONERS' RULE CHALLENGE

Below we set forth the relevant provisions of ORS 183.400 and then turn to each of petitioners' three assignments of error.

A.   *Review Under ORS 183.400*

As noted, petitioners bring this rule challenge under ORS 183.400. "That statute provides for a limited range of judicial review." *Nay v. Dept. of Human Services*, 360 Or 668, 679, 385 P3d 1001 (2016). Specifically, under ORS 183.400(4), the court may declare a rule invalid only in limited circumstances—namely, if the rule:

"(a)   Violates constitutional provisions;

"(b)   Exceeds the statutory authority of the agency; or

"(c)   Was adopted without compliance with applicable rulemaking procedures."

The record before this court is also limited in a rule challenge under ORS 183.400. Specifically, under ORS 183.400(3):

"Judicial review of a rule shall be limited to an examination of:

"(a)  The rule under review;

"(b)  The statutory provisions authorizing the rule; and

"(c)  Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures."

## B.  *Petitioners' First Assignment of Error*

In their first assignment of error, petitioners raise a few distinct arguments. First, petitioners contend that the temporary rules were invalid because they exceeded ODFW's statutory authority under ORS 496.435. Second, we understand petitioners to contend that the temporary rules were invalid because the temporary rules violated a purported "procedural framework" for rulemaking set forth in OAR 635-007-0505.[7] Finally, petitioners contend that the temporary rules were invalid under ORS 496.162(1), because the record "demonstrates ODFW's failure to investigate the supply and condition of the 2023 Fall Chinook Run."

### 1.  *ORS 496.435*

ORS 496.435 sets forth that it is "a goal of the people of the State of Oregon to achieve recovery and sustainability of native stocks of salmon." It provides, in full:

"Consistent with other provisions of law, it is declared to be a goal of the people of the State of Oregon to achieve recovery and sustainability of native stocks of salmon and trout. In order to achieve this goal in a cost-effective manner, the State of Oregon shall engage in a program to rehabilitate and improve natural habitat and native stocks and ensure that the level of harvest does not exceed the capacity of stocks to reproduce themselves. The State of Oregon shall promote rehabilitation of salmon and trout populations by reintroducing the fish to habitats by using the salmon and trout enhancement program and remote hatchboxes."

---

[7] Petitioners also contend that the temporary rules violated "procedural mandates" that ODFW was required to follow in OAR 635-500-6775 and the CMP itself. Those arguments are not developed, however, so we decline to consider them. *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be" nor "to make or develop a party's argument when that party has not endeavored to do so itself.").

As we understand it, petitioners argue that the temporary rules exceeded ODFW's statutory authority under ORS 496.435, and are therefore invalid pursuant to ORS 183.400(4)(b), because: (1) OAR 635-007-0505(1) provides that the state's "Native Fish Conservation Policy shall be implemented primarily through conservation plans"; (2) OAR 635-500-6775(1) provides that the CMP, which is a conservation plan, "implements the State's strategy for protecting, enhancing and utilizing Oregon populations of Chinook salmon," (3) and the temporary rules depart from the CMP.

There are two chief difficulties with petitioners' argument. The first is related to the nature of our review under ORS 183.400(4)(b). The question in determining if a rule exceeds statutory authority is whether the rule corresponds to the statutory policy as we understand it. *Managed Healthcare Northwest v. DCBS*, 338 Or 92, 96, 106 P3d 624 (2005) (citing *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 573, 687 P2d 785 (1984)). In making that particular determination, "our record on review consists of two things only: the wording of the rule itself (read in context) and the statutory provisions authorizing the rule." *Industrial Customers v. Oregon Dept. of Energy*, 238 Or App 127, 129-30, 241 P3d 352 (2010) (internal quotation marks omitted).

Here, the statutory policy of ORS 496.435 is plain: "[T]o achieve recovery and sustainability of native stocks of salmon and trout," and to do so by ensuring "that the level of harvest does not exceed the capacity of stocks to reproduce themselves." Consistent with that policy, as described above, the purpose of the temporary rules is to "protect wild Chinook by increasing the likelihood that runs will remain above critical abundance by reducing angler impacts on that species." Thus, we conclude that the temporary rules are within the range of discretion allowed by ORS 496.435. *See United Telephone Employees PAC v. Secretary of State*, 138 Or App 135, 139, 906 P2d 306 (1995) ("A rule promulgated under a statute is valid if it is within the range of discretion allowed by the general policies declared in the statute."). Whether the temporary rules will actually operate to fulfill that policy goal is a wholly different kettle of fish and

is beyond the scope of a rule challenge under ORS 183.400. *Schlip v. Oregon Fish and Wildlife Comm.*, 75 Or App 462, 467, 707 P2d 606 (1985) (in a rule challenge under ORS 183.400, "[t]he efficacy of the rules is not subject to review by this court").

Second, we understand petitioners' argument concerning ORS 496.435 to rest on the premise that the temporary rules violate ORS 496.435, because they contravene the CMP. But as ODFW points out, ODFW rules recognize that the CMP—at least insofar as ODFW's role in implementing the CMP is concerned—is "not intended to be a rigid recipe." OAR 635-500-6775(1). And the CMP itself contemplates that if "review of the annually collected information appears to show that progress is not being made towards desired status goals, including optimizing harvest opportunities, or some populations are declining towards their critical abundance levels, ODFW will consider if *additional*, or *alternative*, actions need to be implemented to change the trajectory." (Emphases added.)

Given the nature of the CMP and ODFW's accompanying rules, at bottom, the difficulty with petitioners' argument is that they have not pointed to authority that leads to a conclusion that the CMP as a whole is legally enforceable such that ODFW's rules regarding fisheries must follow its dictates, *cf.* OAR 635-500-0002 ("The administrative rules contained in this division are the legally enforceable elements of fish management plans."), nor have petitioners developed an argument that the specific provisions of the CMP from which ODFW allegedly departed somehow inhibit ODFW's rulemaking authority.

2. *OAR 635-007-0505*

Petitioners also contend that the temporary rules are invalid because their adoption did not comply with applicable procedures pursuant to ORS 183.400(4)(c), because, according to petitioners, OAR 635-007-0505 creates "a procedural framework which ODFW must respect when it seeks to manage native fisheries." Specifically, as petitioners see it, under OAR 635-007-0505, ODFW "must manage according to conservation plans where available, and if

none are available ODFW must create conservation plans following the mandates of OAR 635-007-0505(2) to (8)(c)." Petitioners contend that those procedures call for "collaborative, science-based management of native fish" and were "cast aside" in ODFW's adoption of the temporary rules.

We disagree with petitioners' understanding of OAR 635-007-0505. That administrative rule provides that "the Native Fish Conservation Policy shall be implemented primarily through conservation plans developed for individual species management units and adopted by the Commission," sets forth what the contents of such plans will be,[8] and contains steps for developing such conservation plans.[9] Assuming without deciding that an agency's noncompliance with its own administrative rule can provide the basis for invalidating a temporary rule, we perceive of nothing in OAR 635-007-0505 that creates a "procedural

_____

[8] OAR 635-007-0505(5) provides, in part:

"Native fish conservation plans will address the following elements:

"(a) Identification of the species management unit and constituent populations pursuant to subsection (4) of this rule;

"* * * * *

"(f) A description of monitoring, evaluation, and research necessary to gauge the success of corrective strategies and resolve uncertainties;

"(g) A process for modifying corrective strategies based upon the monitoring, evaluation and research results;

"(h) Measurable criteria indicating significant deterioration in status, triggering plan modification to begin or expand recovery actions;

"(i) Annual and long-term reporting requirements necessary to document data, departures from the plan, and evaluations necessary for adaptive management, in a format available to the public[.]"

[9] OAR 635-007-0505(8) provides:

"Process for Developing Plans: When developing fish conservation plans, delineating naturally reproducing populations, and defining species management unit borders, the Department shall:

"(a) Use the most up-to-date and reliable scientific information and, as appropriate, convene an ad hoc team of scientists for collaboration and assistance;

"(b) Solicit the assistance and independent peer review by scientists including but not limited to the Independent Multidisciplinary Science Team and university fishery management programs; and

"(c) Seek input and involvement from appropriate tribal, state, local, and federal management partners, university programs, and the public. Affected tribal governments shall be consulted in the development and implementation of conservation plans."

framework" that ODFW must follow before adopting temporary rules in furtherance of its statutory charge or otherwise restrains its ability to do so.

### 3.   *ORS 496.162(1)*

Petitioners contend that ODFW violated the "procedural mandate of ORS 496.162(1)," which as petitioners see it, "requires that the agency investigate the supply and condition of wildlife before establishing the amounts of wildlife that may be taken and possessed." As noted, ORS 496.162(1) provides, in relevant part, that "[a]fter investigation of the supply and condition of wildlife, the State Fish and Wildlife Commission, at appropriate times each year, shall by rule *** [p]rescribe the times, places and manner in which wildlife may be taken by angling, hunting, trapping or other method and the amounts of each of those wildlife species that may be taken and possessed."

Petitioners contend that, because ODFW did not comply with the procedures required by ORS 496.162(1), the temporary rules are invalid. Specifically, they assert that "the lack of evidence showing that ODFW engaged in any kind of investigation prior to adopting the temporary rules is affirmative proof that ODFW did not satisfy ORS 496.162(1)."

Assuming without deciding that an investigation under ORS 496.162(1) was a statutory prerequisite for the adoption of the temporary rules, the rulemaking record indicates that ODFW undertook the requisite investigation. ORS 183.400(3)(c) (in a rule challenge under ORS 183.400(4)(c) the court may consider "all documents necessary to demonstrate compliance with applicable rulemaking procedures"). Or, at the very least, the record does not contain a "lack of evidence showing that ODFW engaged in any kind of investigation" prior to adopting the temporary rules, as petitioners assert.

Here, the record reflects that ODFW, in adopting the temporary rules, considered information about the "supply and condition" of salmon as require by ORS 496.162(1)—*e.g.*, it considered forecasts for the 2023 return for wild salmon, "[n]ew and rapid changes in the freshwater and ocean

environment resulting in drought, heat domes, non-native predator expansions, wildfires, and marine heatwaves," and that "*the [d]epartment's monitoring* indicates that returns of wild Chinook have been at or below critical abundance in several coastal basins over the past several years and that freshwater harvest rates have been increasing." (Emphasis added.) That is, contrary to petitioners' assertion, it is not the case that the record reflects that ODFW failed to engage "in any kind of investigation prior to adopting the temporary rules."[10] *See Fund For Animals v. Dept. of Fish & Wildlife*, 94 Or App 211, 213, 765 P2d 215 (1988), *rev dismissed*, 307 Or 611 (1989) (rejecting the petitioners' argument that an ODFW rule setting seasons and numbers of tags for hunting cougars was invalid under ORS 496.162(1), where, although "ODFW has never performed a comprehensive survey of [cougar] numbers or condition," OFDW's "recommendations for the dates and areas of permitted hunting and for the number of tags" were based on "general knowledge of cougar habits and habitats" and "the number of cougars taken each year and of the number of complaints of cougar damage it has received").[11]

## C.  *Petitioners' Second Assignment of Error*

In their second assignment of error, petitioners contend that the "prejudice statement" issued by ODFW pursuant to ORS 183.335(5)(a) was "insufficient to demonstrate serious prejudice and unsupported by evidence in the record." Petitioners contend that that deficiency means that the temporary rules were adopted without compliance with

---

[10] Neither party addresses whether "substantial compliance" with ORS 496.162 rather than "compliance" with ORS 496.162 is sufficient. *N.W. Natural Gas Co.v. Environ. Quality Comm.*, 329 Or App 648, 656, 542 P3d 71 (2023) ("Whether the doctrine of substantial compliance applies is a question of statutory interpretation." (Internal quotation marks omitted.)).

We need not resolve that issue, however, because the rulemaking record reflects ODFW's compliance with ORS 496.162.

[11]  The petitioners in *Fund For Animals* raised their rule challenge concerning ODFW's compliance with ORS 496.162(1) under ORS 183.400(4)(b). Petitioners in this case raised their rule challenge concerning ODFW's compliance with ORS 496.162(1) under ORS 183.400(4)(c). Notwithstanding that distinction, petitioners assert that *Fund For Animals* "provides the requisite analysis" that we should use in considering their contention that ODFW violated ORS 496.162(1), and we agree that *Fund For Animals* is instructive.

applicable procedures, rendering them invalid under ORS 183.400(4)(c).

ORS 183.335(5) sets forth certain prerequisites for an agency's adoption temporary rules—*i.e.*, rules that are not subject to the normal notice and comment requirements of the Administrative Procedures Act. Among others, the agency must provide "a statement of its findings that its failure to act promptly will result in serious prejudice to the public interest or the interest of the parties concerned and the specific reasons for its findings of prejudice." ORS 183.335(5)(a).

We review an agency's compliance with the rulemaking procedures set forth in ORS 183.335 for "substantial compliance." *Friends of Columbia Gorge v. Energy Fac. Siting Coun.*, 365 Or 371, 377, 446 P3d 53 (2019) (*Friends I*) (observing that "a rule adopted in substantial compliance with ORS 183.335 is a rule adopted in 'compliance with applicable rulemaking procedures'" (quoting ORS 183.400(4)(c)). "Substantial compliance can be defined only in general language, but at bottom it requires compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." *N.W. Natural Gas Co. v. Environ. Quality Comm.*, 329 Or App 648, 542 P3d 71 (2023) (internal quotation marks omitted).

The objective of ORS 183.335(5)(a) is to allow courts to "review [the agencies'] findings and prevent agencies from needlessly excluding the public from the rulemaking process." *Friends of Columbia Gorge v. Energy Fac. Siting Coun.*, 366 Or 78, 90, 456 P3d 635 (2020) (*Friends II*).

Further, as a consequence of the purpose of ORS 183.335(5)(a), courts must "review an agency's determination 'that its failure to act promptly will result in serious prejudice to the public interest or the interest of the parties concerned.'" *Id.* (quoting ORS 183.335(5)(a)).

As noted, ODFW's prejudice statement reflects that ODFW found that there "is a substantial likelihood that absent immediate implementation of conservation measures wild Chinook may be adversely affected (*i.e.*, overharvested)." Or, put more concretely, that "protective measures

are necessary to prevent serious depletion of wild Chinook and also to provide the optimum recreational and aesthetic benefits for present and future generations of the citizens of this state." *See* ORS 496.012 ("It is the policy of the State of Oregon that wildlife shall be managed to prevent serious depletion of any indigenous species and to provide the optimum recreational and aesthetic benefits for present and future generations of the citizens of this state."). ODFW further included findings explaining why temporary rulemaking was necessary—*e.g.*, returns of wild Chinook below "critical abundance in several coastal basins during the past several years," an increase in "freshwater harvest rates," less confidence in the certainty of its forecasts, and that "[t]here is not adequate time to go through permanent rulemaking proceedings *** as the species are expected to imminently return to freshwater."

Thus, the agency provided both a "statement of its findings that its failure to act promptly will result in serious prejudice to the public interest" and "the specific reasons for its findings of prejudice" as required by ORS 183.335(5)(a). And, having reviewed ODFW's determination that its failure to act promptly will result in serious prejudice to the public interest or the interest of the parties concerned as required by *Friends II*, we conclude that the statement of serious prejudice is sufficient. *See* 366 Or at 93 (statement sufficient where agency "identified serious prejudice that would result from foregoing temporary rulemaking and waiting to complete the permanent rulemaking process"). That is, contrary to petitioners' contentions, ODFW met its obligations under ORS 183.335(5)(a).

D.   *Petitioners' Third Assignment of Error*

In their third assignment of error, petitioners contend that the temporary rules were invalid because their adoption violated "the Oregon Constitution's separation of powers doctrine." Although petitioners do not point to a specific provision of the Oregon Constitution, we understand them to rely on Article III, section 1, which provides:

"The powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; *and no person*

*charged with official duties under one of these branches, shall exercise any of the functions of another, except as in this Constitution expressly provided."*

(Emphasis added.) As we understand petitioners' position, their primary argument is that "the [temporary] rules themselves—not necessarily the overarching statutes—are an unlawful act of legislative authority, violating the separation of powers doctrine," because the process by which those temporary rules were adopted lacked "safeguards against arbitrariness."

In considering petitioners' argument, we find instructive *Bercot v. Ore. Transportation Comm.*, 31 Or App 449, 570 P2d 1195 (1977), where we rejected a similar argument. In that case, pursuant to ORS 183.400, the petitioner challenged the validity of a rule promulgated by the Oregon Transportation Commission. *Bercot*, 31 Or at 451. Among other points, the petitioner contended that the rule and the statutory authority for it were an "unconstitutional delegation of legislative authority" and that, because "no factual basis for rulemaking is required in direct review of rules [under ORS 183.400]," the petitioner had "no real protection against improper agency action." *Id.* at 452.

We disagreed, holding that "the appeal procedure for review of administrative action under ORS 183.400 and 183.482(8)(c) [providing for judicial review of orders in contested cases]" is "sufficient to sustain a delegation of legislative authority." *Id.* at 452-53.

The same is true here, particularly in view of the specific goals for wildlife management that ODFW has been directed by the legislature to implement. ORS 496.012; *see also Oregon Assn. of Rehab. Prof. v. Dept. of Ins.*, 99 Or App 613, 617-18, 783 P2d 1014 (1989) (statute "authorizing the agency to adopt rules establishing rates" was not an "unconstitutional delegation of legislative authority" where the agency was "specifically required by statute to establish rates that are reasonable through the adoption of administrative rules" and if the rates were not "reasonable, they would exceed the agency's authority and would be subject to challenge under ORS 183.400(4)(b)"); *see generally* Office of

Legislative Counsel, Bill Drafting Manual 8.12-16 (18th ed 2018) (discussing delegation to state agencies).

Petitioners contend that *Bercot* is distinguishable, because *Bercot* "involved a permanent rule subject to the more-rigorous rulemaking procedures designed to guard against arbitrariness," but petitioners do not meaningfully develop that argument. In any event, we note that, unlike our review of permanent rules, in the context of temporary rules, courts "review an agency's determination 'that its failure to act promptly will result in serious prejudice to the public interest or the interest of the parties concerned,'" *Friends II*, 366 Or at 90 (quoting ORS 183.335(5)(a)), which we have done in this case. Consistent with *Bercot*, we conclude that the temporary rules in this case are not invalid under ORS 183.400(4)(a) because they violate the "Oregon Constitution's separation of powers doctrine."

Rules held valid.